**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-1710
_____

UNITED STATES OF AMERICA,


v.

DAVID B. KILKEARY,
                                        Appellant.
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Criminal No. 2-09-cr-00363-001)
District Judge: Honorable Peter G. Sheridan
_____

Submitted Under Third Circuit LAR 34.1(a)
January 13, 2011

Before:   SCIRICA, BARRY, and VANASKIE, <u>Circuit</u> <u>Judges</u>.

(Filed: February 1, 2011)
_____

OPINION OF THE COURT
_____

VANASKIE, Circuit Judge.

Appellant David B. Kilkeary ("Kilkeary") appeals a twenty-five-year sentence imposed on him following his guilty plea to criminal charges stemming from his attempt to extort $3 million from an Atlantic City casino by holding hostages on a casino shuttle bus. Kilkeary claims that the District Court violated his Fifth Amendment right to due process of law, and committed both procedural and substantive error in sentencing him. Because we find that the District Court did not err, we will affirm.

I.

On November 13, 2007, Kilkeary implemented a complicated scheme to extort $3 million from the Showboat Hotel & Casino (the "Showboat") in Atlantic City, New Jersey.[1] Kilkeary decided to take hostages on a casino shuttle bus by threatening them with a fake handgun and a hoax bomb, and to plant a fake bomb in the hotel, with the design to trade the hostages and defuse the bombs for cash. After receiving the cash, he planned to escape by diverting the police by throwing a Molotov cocktail from the shuttle bus and driving the shuttle bus into an inlet. There, he would escape by using a self-

---

[1]Kilkeary had previously engaged in illicit schemes to acquire cash. On the night of March 27, 1998, Kilkeary cut a hole in the roof of a bank in Annapolis, Maryland, laying in wait until employees arrived in the morning; he surprised them with a pellet gun, ordered them to sit in a safety deposit booth area and directed two employees to the vault, where he grabbed over $23,500 before fleeing. Then, in July of 1998, Kilkeary attempted to rob another Maryland bank in the same manner. He set off an alarm, however, and left without taking any money. The day after this robbery attempt, Kilkeary returned to the Annapolis bank and used the same scheme to steal $32,000. Because of an alert bystander, however, Kilkeary was apprehended as he fled in his truck into a wooded area. For these offenses, Kilkeary was sentenced to 51 months' imprisonment and three years' supervised release. He completed his term of supervised release on December 19, 2005.

2

propelled scuba scooter to transport himself across the inlet to a nearby beach in Brigantine, New Jersey, retrieve a towel and dry clothing, and complete his escape by taxi to his waiting truck.

In pursuit of his plan, Kilkeary rented a scuba tank, regulator, suit, and mask, and purchased a scuba motor. To avoid suspicion, he simultaneously signed up for scuba classes. He also purchased a pellet gun, wig and ski mask, and constructed a hoax bomb, suicide bomb vest, and detonation device, as well as a Molotov cocktail. Kilkeary lied to his wife and family, telling them that he was meeting a potential buyer of his construction business for a sale that would net $150,000.

On November 13, 2007, Kilkeary first stopped at his escape destination on the beach in Brigantine, where he secreted a garbage bag containing towels, a change of clothes, and a $20 bill for transportation back to his truck. At about 8:30 p.m., he departed for the casino. Along the way, however, he stopped his truck for about ten minutes and contemplated the gravity of what he was about to do. Although he knew that what he was about to do was "wrong," he determined to press on.

Kilkeary arrived at the Showboat at approximately 9:45 p.m. and placed the hoax bomb in a second-floor bathroom next to the casino's poker room. He proceeded to the shuttle bus area. Having determined that the first bus was too crowded, he again stopped for several minutes awaiting the arrival of the second shuttle, and considered whether to proceed. Again, he resolved to act.

When Kilkeary, now disguised, attempted to board the bus, Lee Speller, the bus driver, informed him that he could not do so with large bags. Kilkeary then produced the

3

fake gun and essentially stated, "You are going to drive this bus – I got a bomb." (Presentence Report ("PSR") ¶ 18.) Speller refused the command. In an ensuing physical struggle, Kilkeary and Speller fell out of the bus onto the street. Kilkeary re-entered the bus; the driver, who had sprained both ankles and a wrist, fled to safety.

During the melee, passenger William Haley had exited the bus to assist the driver. Finding this fruitless, he offered to re-enter the bus if Kilkeary would release Haley's wife, Christine. When Kilkeary refused, Haley boarded the bus. Kilkeary threatened his four hostages with the gun, bomb, and detonator, pointing the gun at them and telling them that he would "kill" them and "blow everyone up." (*Id.* ¶ 19-21; A. 356-57.) Kilkeary attempted to drive the bus, but was unsuccessful because he did not know how to release the air brake. Ten minutes later, after holding the gun to her head, Kilkeary released Christine Haley with instructions to inform Showboat security that he had hostages on the bus.

A search of the hotel revealed the planted fake bomb. As a result of this discovery, the casino evacuated some 1500 to 2000 guests.

Kilkeary then attempted to relocate himself and his hostages to a second bus. In the process, William Haley offered to carry Kilkeary's bags if the two remaining passengers were released. Kilkeary agreed, and the two passengers were released. After assisting Kilkeary in transferring the bags to a second bus, Haley managed to escape.

Kilkeary, now alone, attempted to drive away in the second bus, but there were no keys. Law enforcement robotically delivered a cell phone to him, through which he negotiated for five and a half hours, pretending to be a former General from the Republic

4

of Georgia and speaking with a Russian accent. After an aborted SWAT raid, Kilkeary surrendered to law enforcement at approximately 4:18 a.m.

On May 18, 2009, a grand jury sitting in and for the District of New Jersey returned a three-count indictment, charging Kilkeary with willfully threatening to cause harm to persons and property by conveying false information that bombs he intended to detonate were genuine explosives, in violation of 18 U.S.C. §§ 844(e) and 2; kidnapping through an instrumentality of interstate commerce, in violation of 18 U.S.C. §§ 1201(a) and 2; and extortion, in violation of 18 U.S.C. §§ 1951(a) and 2. Kilkeary pleaded guilty to all counts on August 19, 2009.

The District Court held a sentencing hearing on March 4 and 5, 2010. After considering extensive oral, written, and taped evidence, the court determined that Kilkeary's total offense level was 35, his criminal history category was II, and the applicable advisory Guidelines range was 188 to 235 months' incarceration. Next, there being no departure motions, the court considered Kilkeary's request for a downward variance based on the evidence concerning his mental health, and rejected it. The court considered the Government's request for an upward variance, and granted it in part. The court entered judgment on March 12, 2010, imposing a sentence of 300 months' incarceration and five years' supervised release.

## II.

The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

5

"Our appellate review proceeds in two stages." *United States v. Tomko*, 562 F.3d 558, 567 (3d Cir. 2009) (en banc). First, we ensure "'that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence – including an explanation for any deviation from the Guidelines range.'" *Id.* (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)). If the district court's procedure is satisfactory, we move to stage two, considering the substantive reasonableness of the sentence. *Id.* (citing *United States v. Levinson*, 543 F.3d 190, 195 (3d Cir. 2008)). The substantive review mandates that we consider the totality of the circumstances, rather than one or two factors. *Id.* Our review for both procedural and substantive error proceeds under an abuse of discretion standard. *Id.* "We afford deference to the District Court because it is in the best position to determine the appropriate sentence in light of the particular circumstances of the case." *United States v. Dragon*, 471 F.3d 501, 506 (3d Cir. 2006) (internal quotation marks omitted).

Kilkeary argues that the District Court committed procedural error in failing to adequately explain its sentence and in failing to adequately address his argument that his mental illness was such a significant factor in the commission of the crime as to warrant a below-Guidelines range sentence. As to substantive error, Kilkeary argues, first, that the 65-month upward variance was unreasonable because the Guidelines calculation already reflected the nature of his crime, any enhancement based on the number of victims is unclear, and that his criminal history was adequately reflected in his Guidelines range;

6

and second, that his sentence was unreasonable in light of the psychological reports and testimony presented at the sentencing hearing regarding his mental illness. He also argues that the lack of clarity in the District Court's explanation violated his Fifth Amendment due process rights. We will consider each of his contentions in turn.

A.

Our review of the record reveals that the District Court did not commit procedural error. It properly calculated the advisory Guidelines range, addressed all pertinent § 3553(a) factors, acknowledged its authority to impose a below-Guidelines range sentence based upon Kilkeary's mental health arguments, and adequately explained the reasons for its chosen sentence.

The District Court indicated that its upward variance was based on the "need to protect and respect the law as we know it[,] . . . [and] to afford adequate deterrence against future criminal conduct of Mr. Kilkeary." (A. 393.) The District Court noted that, because there were five hostages on the bus, "it could have been five counts of each charge." (*Id.*) Finally, the District Court stated that "this crime is just very heinous. And . . . it caused a lot of harm to both the victims, and to the people at the Showboat Casino Hotel at that time." (*Id.*) In imposing the sentence, the District Court noted that "we need to protect the public from further crimes of Mr. Kilkeary. . . . [H]e's had three prior bank robberies, then he had this hostage situation in Atlantic City." (*Id.* at 398.) Further, the District Court observed that "when you take five hostages, when you tell these hostages that you have a gun pointed at their head, and that you planted a bomb in the Showboat Hotel, and you have a Molotov cocktail with you, there needs to be just

7

punishment for that offense." (*Id.*)  The Statement of Reasons accompanying the

Judgment explicitly mentions the number of victims and Kilkeary's criminal history as

bases for the upward variance.  The written judgment rider, docketed four days after the

sentencing proceeding, is entirely consistent with this reasoning.  It cites the "egregious"

nature of the crime, including Defendant's threats to kill his hostages, his possession of a

"realistic looking pistol," and his use of a fake bomb.  (*Id.* at 7.)  The rider cites

Kilkeary's prior criminal history of three bank robberies also involving hostages, and the

need for public protection.  (*Id.*)  Finally, it notes that his criminal history is not

adequately reflected in his Guidelines calculation.  (*Id.*)  Accordingly, the District Court

went beyond mere formalism, relied on the information presented to it, and adequately

explained its reasons for imposing a sentence that represented an upward variance of 65

months.

Second, the District Court adequately addressed Kilkeary's argument that his

mental illness was a mitigating factor.  Essentially, Kilkeary argued that his mental

illness impaired his ability to control his actions.  Although the District Court referenced

the elements of U.S.S.G. § 5K2.13, which govern a formal departure from the Guidelines

on grounds of diminished mental capacity, rather than a § 3553(a) variance, it pointed out

that it was considering a variance, not a departure, and that a failure to satisfy § 5K2.13

did not bar a variance in this case.  The District Court considered the various mental

health evaluations presented to it, which ranged from a diagnosis of bipolar disorder,[2] to

---

[2]Bipolar disorder, also known as manic-depressive illness, is a brain disorder that
causes unusual shifts in mood, energy, activity levels, and the ability to carry out

cyclothymic disorder,[3] to concern that his symptoms were feigned.  After considering

extensive argument from both parties on the issue, the court concluded:

> [H]aving considered the mental and emotional condition of the defendant, and in weighing it against the other factors under 3553, to reflect the seriousness of the offense, to make sure that the public is not victimized anymore by Mr. Kilkeary, and that we promote adequate justice, it seems to me that a downward departure for Mr. Kilkeary is unwarranted . . . .

(A. 392.)  It is evident from this and other statements made by the District Court in

pronouncing the sentence that the District Court gave very careful consideration of all the

evidence, including evidence pertaining to Kilkeary's mental health.  Thus, Kilkeary's

claims of procedural error lack merit.

B.

Our review of the record further reveals that the District Court did not commit

substantive error.  In this respect, Kilkeary advances two arguments.  First, he claims that

---

day-to-day tasks. Symptoms of bipolar disorder are severe. They are different from the normal ups and downs that everyone goes through from time to time. Bipolar disorder symptoms can result in damaged relationships, poor job or school performance, and even suicide. Bipolar disorder is not easy to spot when it starts. . . . The symptoms may seem like separate problems, not recognized as parts of a larger problem. Some people suffer for years before they are properly diagnosed and treated.
National Institute of Mental Health, Introduction: Bipolar Disorder, http://www.nimh.nih.gov/health/publications/bipolar-disorder/complete-index.shtml#pub1 (last visited Jan. 24, 2011).

[3]"Cyclothymic Disorder, or Cyclothymia, is a mild form of bipolar disorder. People who have cyclothymia have episodes of hypomania that shift back and forth with mild depression for at least two years. However, the symptoms do not meet the diagnostic requirements for any other type of bipolar disorder."  National Institute of Mental Health, Introduction: Bipolar Disorder, http://www.nimh.nih.gov/health/publications/bipolar-disorder/complete-index.shtml#pub1 (last visited Jan. 24, 2011).

the 65-month upward variance was substantively unreasonable. He bases this claim on numerous factors, including that his Guidelines calculation already adequately reflected the nature of his crime. Kilkeary also contends that the District Court's calculation of the number of victims is unclear, and that it is not certain whether the District Court was referring merely to the five hostages or to the 1500-2000 individuals who were impacted by the casino evacuation. As to the five hostages, Kilkeary contends that these victims were adequately reflected in his Guidelines calculation. As to the casino patrons, Kilkeary contends that there was insufficient evidence to demonstrate how many people were impacted by his actions. Finally, Kilkeary contends that his criminal history was adequately reflected in the Guidelines and should not have been grounds for a variance. If anything, he argues, his criminal history demonstrates his mental illness and should have resulted in a reduced sentence.

These arguments are without merit. Although the court considered the physical injury to Speller and the abduction of Haley in its Guidelines calculation, it was not error for the court to vary upward from the Guidelines on the basis of multiple victims. *See United States v. Greenidge*, 495 F.3d 85, 103 (3d Cir. 2007) ("We emphasize that a sentencing court is not prohibited from considering the factual basis underlying a defendant's sentence enhancements, and indeed, *should* consider those facts in order to tailor the sentence to the defendant's individual circumstances."). Furthermore, it was appropriate for the court to consider the impact of Kilkeary's conduct on the Showboat Casino patrons, who were indisputably evacuated for an extended period in the November night. The court noted that this impact was not adequately reflected in the

10

Guidelines assessment of victims. The District Court, moreover, was statutorily empowered to consider Kilkeary's criminal history in the context of the § 3553(a) factors in determining to impose an upward variance, as well as in the Guidelines calculation. *See* 18 U.S.C. § 3553(a)(1) (requiring the court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant"). It was certainly not error for it to do so.

Second, Kilkeary argues that his sentence was substantively unreasonable in light of the expert psychological reports and testimony presented at the sentencing hearing regarding his mental health. These reports and testimony were by no means consistent on all issues, however. *See, e.g.,* United States Department of Justice, Federal Bureau of Prisons, Federal Medical Center Forensic Report, June 23, 2008, A. 163 ("Mr. Kilkeary's report and presentation during the current evaluation is strongly suggestive of exaggeration and, in some cases, outright feigning of mental health symptoms."). Moreover, the District Court had an ample evidentiary foundation for the sentence imposed in this case.

In summary, we cannot say that "no reasonable sentencing court would have imposed the same sentence on [Kilkeary] for the reasons the district court provided." *Tomko*, 562 F.3d at 568. Accordingly, Kilkeary has failed to show that his sentence is substantively unreasonable.

## C.

Kilkeary also asserts that the District Court deprived him of due process by failing to articulate a clear rationale for the sentence that was imposed. He also contends that the

11

judgment rider is so inconsistent with the District Court's statements at the time of sentencing as to deprive Kilkeary of the requisite unambiguous explanation for the sentence imposed. Our review is plenary. *United States v. Dees*, 467 F.3d 847, 854 (3d Cir. 2006). As explained above, we find that the District Court articulated a clear rationale for the sentence imposed, and the judgment rider is entirely consistent with the explanation given at the time of sentencing. Accordingly, there is no violation of Kilkeary's Fifth Amendment due process rights.

III.

For the foregoing reasons, we will affirm the District Court's judgment.