PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 10-1050/1487
_____

UNITED STATES OF AMERICA,
                                                  Appellant

v.

PAUL NEGRONI
and
JAMES HALL, IV.
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Nos. 08-cr-550-4 and 08-cr-550-3)
District Judge:  Hon. Timothy J. Savage
_____

Argued
February 8, 2011

Before:  JORDAN, GREENAWAY, JR. and STAPLETON,
*Circuit Judges*.

(Filed  March 29, 2011 )
_____

Derek A. Cohen
Louis D. Lappen   [ARGUED]
Robert A. Zauzmer
Office of United States Attorney
615 Chestnut Street - #1250
Philadelphia, PA   19106
    *Counsel for Appellant*

Peter Goldberger   [ARGUED]
50 Rittenhouse Place
Ardmore, PA   19003

Stephen R. LaCheen
LaCheen Wittels & Greenberg
1429 Walnut Street - #1301
Philadelphia, PA   19102
    *Counsel for Appellee Paul Negroni*

Ann C. Flannery   [ARGUED]
1835 Market Street – #2700
Philadelphia, PA   19103
    *Counsel for Appellee James Hall, IV*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

## I.    Background

The United States appeals orders of the United States District Court for the Eastern District of Pennsylvania sentencing Appellee James Hall to fifteen months' imprisonment and Appellee Paul Negroni to five years' probation, including nine months' in-home detention. Because the District Court committed procedural error in reaching both of those sentences, we will vacate the orders and remand for resentencing.

### A.    *Factual History*

These consolidated cases spring from a massive fraud scheme organized and conducted by a man named Kevin Waltzer.    Between the years 2000 and 2008, Waltzer fraudulently obtained more than $40 million in payments from settlement funds in three class action lawsuits: *In re Nasdaq Market-Makers Antitrust Litigation*, No. Civ. 94-3996(RWS) (S.D.N.Y.) (the "Nasdaq Class Action"), *In re Cendant Corporation Litigation*, No. Civ. 98-1664(WHW) (D.N.J.) (the "Cendant Class Action"), and *In re BankAmerica Corporation Securities Litigation*, No. MDL 1264 (E.D. Mo.) (the "BankAmerica Class Action").    His scheme involved the submission of false claims in which he, or individuals enlisted by him, asserted ownership or the trading of certain relevant securities during the relevant class periods when, in fact, the claimants did not own or trade the securities and, thus, were not entitled to recovery.

Waltzer and his cohorts took elaborate steps to perpetrate the scheme, including the creation of fake corporations, the establishment of virtual offices for those corporations, and the creation of fake financial documents that indicated ownership and trades. In addition, one of the schemers, Christian J. Penta ("Penta"), was employed by Heffler, Raditich, & Saitta ("Heffler"), the accounting firm responsible for distributing settlement funds, and took steps to ensure that claims were approved without anyone at Heffler becoming aware of the fraud. In 2007, the scheme was uncovered by the IRS, and, in cooperation with the IRS investigation, Waltzer began to provide information regarding the other individuals involved, including Hall and Negroni.

### 1.     Hall's Role in the Scheme

Hall's role dated to 2002, when, as he later admitted, he submitted a fraudulent claim in the Nasdaq Class Action. In that claim, he falsely stated that he had traded more than 19 million shares of Nasdaq listed securities. As recompense, Hall received $507,910.99, of which he wired $200,000 to Waltzer and $100,000 to Penta as their shares of the theft.

The government alleged that Hall also participated in making other fraudulent claims, and the initial Presentence Investigation Report in his case (the "PSR") contained an outline of his involvement in those claims. More particularly, based on information obtained from Waltzer, Paragraph 45 of the PSR stated that Hall had assisted Waltzer by impersonating representatives of fake companies that were used for submitting claims. For instance, after a $2,144,778.85 check issued for a claim filed in the Cendant Class Action on behalf of a fake company called Far East

4

Trading, LLC ("Far East"), Hall posed as a fictional partner in Far East, contacted the bank in which the funds were deposited, and authorized Waltzer to receive the proceeds of the check on behalf of Far East. As described later in greater detail, the District Court struck Paragraph 45 from the PSR before sentencing Hall.

### 2. *Negroni's Role in the Scheme*

From his youth, Negroni had known and associated with Waltzer, and, like Hall, Negroni submitted a false claim in the Nasdaq Class Action in 2002, stating that he had traded millions of shares of Nasdaq listed securities during the class period. He received $449,009.23 as payment for that claim. Negroni also assisted Waltzer in creating a fake corporation called the Denver Corporation ("Denver"), for which Waltzer submitted a fraudulent claim in the BankAmerica Class Action. Denver received a check for $228,795.82 as payment for that claim, which Negroni deposited into an account he had created for Denver. On September 23, 2004, Negroni wired $190,000 of the proceeds from that check to Waltzer's bank account.

### B. *Procedural History*

On June 30, 2009, Negroni pled guilty to mail fraud, wire fraud, and money laundering[1] and, on July 1, 2009, Hall

---

[1] Specifically, Negroni's plea agreement states that he "agreed to plead guilty to the following charges in the superseding indictment: two counts of mail fraud, in violation of 18 U.S.C. §§ 1341, 1346, and 1349 (Counts 2 and 3), three counts of wire fraud, in violation of 18 U.S.C. §§ 1343, 1346,

pled guilty to mail fraud, wire fraud, and tax evasion.[2] Sentencing hearings for both defendants were held on November 23, 2009.

## 1. *Hall's Sentencing Hearing*

At sentencing, the government argued for an offense level for Hall of 29, which included a six-level enhancement under U.S. Sentencing Guidelines ("USSG" or the "Guidelines") § 2B1.1(b)(2)(C) based on the government's assertion that Hall's offense involved more than 250 victims. Although Hall had pled only to participation in the Nasdaq Class Action, which was not shown to involve more than 250 victims, the government argued and presented evidence that Hall facilitated false claims submitted in the Cendant and BankAmerica Class Actions, which did involve such large numbers of victims.

To support its argument, the government presented testimony from IRS Agent Thomas Kauffman ("Kauffman"),

___

and 1349 (Counts 7, 10, and 12), two counts of money laundering, in violation of 18 U.S.C. § 1957 (Counts 13 and 14), and aiding and abetting, in violation of 18 U.S.C. § 2." (App. at 71.)

[2] Hall's plea agreement states that he agreed to plead guilty to "one count of mail fraud, in violation of 18 U.S.C. §§ 1341, 1346, and 1349 (Count 1), two counts of wire fraud, in violation of 18 U.S.C. §§ 1343, 1346, and 1349 (Counts 7 and 15), one count of tax evasion, in violation of 26 U.S.C. § 201 (Count 17), and aiding and abetting, in violation of 18 U.S.C. § 2." (App. at 90.)

who recounted Waltzer's description of the fraudulent Far East claim (which was submitted in the Cendant Class Action), including Hall's assistance in getting the money for that claim released to Waltzer. Kauffman also testified regarding an e-mail purportedly sent from Waltzer to Hall that included the script Hall was to follow when posing as the Far East partner (the "script e-mail"). He further testified that, according to Waltzer, Hall had adopted other aliases and made calls to assist Waltzer in other fraudulent claims in both the Cendant and BankAmerica Class Actions. Waltzer's account was corroborated by evidence that he had sent $100,000 to Hall immediately after the Far East check cleared and that, between April 2, 2003 and August 11, 2004, Waltzer wired Hall numerous payments totaling nearly $600,000 (including the $100,000 after the Far East check cleared). Thus Hall's profit from the scheme was alleged to be in excess of $800,000: the more than $200,000 retained from the settlement check he received pursuant to his admitted participation in the false Nasdaq claim, plus several wire transfers from Waltzer amounting to some $600,000. The additional $600,000 is not explained by anything to which Hall has confessed, but Waltzer told Kauffman it was the total of payments he made to Hall for facilitating false claims in the Cendant and BankAmerica Class Actions.[3]

---

[3] The parties have shown some confusion about the exact amount and source of Hall's fraud proceeds. In response to a post-argument letter from Hall's counsel (in which she clarified her position that while there was evidence that Hall had received $800,000 in fraud proceeds, it was not uncontroverted that those proceeds were for participation in the fraudulent scheme), the government's attorney submitted a letter stating that Hall's counsel now recognized Hall had

7

On cross examination, Kauffman acknowledged irregularities regarding the script e-mail, including that it appeared not to have been forensically downloaded from Waltzer's computer as other documents had been, that the body of the e-mail did not appear lined up with the header and "look[ed] like it was printed cock-eyed," (App. at 710) and that the phone number for the e-mail recipient was a New York number, which Hall, who lived in Baltimore, was not known to have. Kauffman also testified that, despite subpoenaing Hall's phone records, the investigators did not find any record of the phone calls Waltzer testified Hall had made.

---

received "proceeds totaling $300,000 (above the $500,000 which Hall received directly from his claim in the NASDAQ litigation)." That response is confusing and does not accurately reflect the record. According to an exhibit prepared by Kauffman, which accompanied his testimony, Hall received a gross total of $1,100,110.99 in fraud proceeds: $507,910.99 from the Nasdaq claim and $592,200 in wired payments from Waltzer. From the Nasdaq claim proceeds, Hall wired $300,000 to Waltzer and Penta. Thus, according to Kauffman's exhibit, Hall's net proceeds were $800,110.99: $207,910.99 from the Nasdaq claim and $592,200 in wired payments from Waltzer.

Whether Hall received an additional $300,000 or $600,000 from Waltzer makes little difference, however, as either way Hall received hundreds of thousands of dollars not explained by his submission of the single claim in the Nasdaq Class Action.

Following Kauffman's testimony, the defense asked the Court to strike Paragraph 45, which outlined Hall's alleged calls on behalf of Far East, as described by Kauffman. The defense argued that "45 relies upon the documents for which there is absolutely no independent corroboration. It came from Waltzer, made by Waltzer, interpreted by Waltzer." (App. at 734.) The District Court responded that it was "not willing to accept carte blanche what Waltzer told anybody" but questioned whether there was "reason to say that [Waltzer was lying] in this context of his testimony" other than "the mere existence of his cooperation status." (App. at 737-38.) The Court did not immediately rule on the defense motion to strike but instead turned to a discussion of other portions of the PSR. At the completion of that discussion, the Court, without explanation, stated that it was "going to strike [P]aragraph 45." (App. at 739.)

As a result of Paragraph 45's removal from the PSR and hence from consideration, the government conceded that the six-level enhancement for 250 or more victims was not appropriate, and the District Court eliminated the enhancement. That resulted in Hall's calculated offense level being 23, and, since his criminal history category was I, the consequent Guidelines range called for 46 to 57 months' imprisonment. The government requested a sentence "in the higher end of the guideline range," giving its reasons as follows:

> The government sees the defendant as more culpable than the remaining defendants. His involvement with Mr. Waltzer was far more extensive. I know your honor struck that paragraph from the presentence report but you

9

heard the testimony of Agent Kauffman, you saw the records and the financial records that showed that this defendant received over $800,000 from Mr. Waltzer for his participation in this scheme.

(App. at 749.)

Despite the government's request for a sentence at the high end of the Guidelines range, the Court varied downward and sentenced Hall to 15 months' imprisonment, as well as restitution in the amount of $572,279.99. The government then objected to the sentence as unreasonable.[4]

---

[4] On appeal, the government's sole basis for contesting Hall's sentence is the argument that the District Court erred procedurally in striking Paragraph 45 and, thus, eliminating the six-level enhancement. Because the government challenges neither the procedural adequacy of any other part of the Court's decision (including the downward variance from the calculated Guidelines range) nor the substantive reasonableness of the sentence, we do not discuss the Court's explanation for those decisions.

We must correct, however, the government's erroneous assertion that, despite its not having addressed the substantive reasonableness of Hall's sentence, it has not waived that issue and may raise it in a future appeal. The government suggests that our decision in *United States v. Merced*, 603 F.3d 203 (3d Cir. 2010), instructs that the procedural and substantive reasonableness of a sentence can and should be raised in separate appeals. *Merced* gives no such instruction but simply explains that "[i]f the district court commits procedural error, our preferred course is to

10

## 2. *Negroni's Sentencing Hearing*

For Negroni, the District Court calculated a criminal history category of I and an offense level of 27, which included the six-level enhancement for 250 or more victims, based on Negroni's involvement in the Denver claim for the BankAmerica Class Action. Those calculations resulted in a Guidelines range of 70 to 87 months' imprisonment. Negroni argued for a downward variance, saying both that he had diminished capacity and that, due to a lack of guidance in his youth, he had developed an unhealthy reliance on Waltzer. To support those claims, Negroni submitted numerous letters

---

remand the case for re-sentencing, without going any further." *Id.* at 214. Thus, if we find that a sentence is the product of procedural error, we may decline to consider any arguments contesting the substantive reasonableness of that sentence until after a district court has corrected the procedural problems. The fact that our decision regarding procedural error may sometimes obviate the need for us to address substantive reasonableness does not, by any stretch, excuse an appellant from raising substantive reasonableness in the initial appeal. Having failed to do so here, the government has waived any challenge to the substantive reasonableness of the sentence now under review.

We do not mean to say, though, that if, on remand, the District Court were to impose a new sentence, the government would not be able to challenge the substantive reasonableness of that sentence. The government would never have had the opportunity to appeal that sentence and, therefore, could not have waived any challenge as to either its procedural or substantive reasonableness.

11

from family and friends and reports from Dr. Thomas Kucharski, a psychologist who evaluated Negroni, and Lara Fastman, a therapist who had treated him.

In letters to the Court, Negroni's brother and wife each described the abuse suffered by Negroni as a child and the lack of male supervision that led Negroni to bond with Waltzer and to look up to him as a father figure. Upon reviewing those letters and evaluating Negroni, Dr. Kucharski reported that "as a result of substantial abuse and neglect [Negroni] suffers from and has suffered from since childhood serious psychological deficits and liabilities," which caused Negroni to "form an intense dependent attachment to Mr. Waltzer." (App. at 289.) That attachment resulted in a "naïve trust in Mr. Waltzer, a strong need to please, low self esteem and a denigrating self appraisal," which "strongly influenced Mr. Negroni's involvement with Mr. Waltzer in the instant offense." (*Id.*) Fastman's report made similar findings, diagnosing Negroni as having "Dependent Personality Disorder," which resulted in an "unhealthy attachment to [Waltzer]," which "prevented him from realizing [Waltzer's] lies and deceits" and "from questioning [Waltzer's] business plans." (App. at 286-87.) She concluded that Negroni's "fear of being alone and without [Waltzer] led him to agree with things he felt wrong rather than risk losing the relationship." (App. at 287.) Negroni also submitted his own letter to the Court in which, despite his experts' assertions about Waltzer's unusual influence in his life, he purported to take "full responsibility for [his] actions," stating that he, not Waltzer, was "responsible for this mistake." (App. at 285.)

12

After hearing the evidence and arguments, the Court considered the factors set forth in 18 U.S.C. § 3553(a) and, while imposing sentence, said the following:

> I consider … the nature and circumstances of the offense.  And in this particular case we have a massive criminal fraud scheme that resulted in a loss of over $40 million that was orchestrated by Kevin Waltzer.
>
> Mr. Negroni's role, albeit not minor, was limited to only a portion of the scheme and loss.  He was involved in not only the fraud itself but also in money laundering.  He was lured into this scam by his long-time friend, Waltzer, whom he knew from childhood and trusted as a brother.  There was also two separate claims in this particular case, Mr. Negroni's alone and then the Denver Corporation later.  He received money from both.
>
> I look at the history and characteristics of the defendant.  And what I see is a 42-year old man who is married and the father of twins.  That he is actively and intimately involved in the nurturing of his children.
>
> He had a disruptive and unstable childhood punctuated by violence.  He has a dependent personality disorder, which makes him a follower rather than a leader.  He is a college graduate who has no prior contact with the criminal justice system.  He is physically well.

13

He has depression, anxiety, which is really a result of his predicament caused by his involvement here. He certainly does not have a substantially reduced mental capacity as a result of his psychological disorder; nevertheless, it is there. He has been involved in various businesses and jobs over the years, with no real substantial income reported. He seems to be a dreamer, a fantasizer of what he can be when he grows up. He has worked as a stock trader on Wall Street businesses. Until I heard him today I was not so sure that he had accepted his responsibility. But I'm convinced that he has and is truly remorseful not only because he has gotten himself in this jam, because he recognizes that it was wrong.

I consider the need to impose a sentence that reflects the seriousness of the offenses as I have described it. To afford deterrence, promote respect for the law, and to protect the public from the defendant's further crimes.

Mr. Negroni will never have any further contact with the criminal justice system. The damage to his reputation and what he has to do now to explain to his children what he has done, and what it means to his reputation are substantial in this case.

I consider the need to provide him with needed educational, vocational training and correctional treatment in the most effective manner, the kind

14

of sentences that are recommended, the sentencing ranges recommended, the pertinent policy statements issued by the sentencing commission, the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct and the need to provide the victims with restitution.

Therefore the Defendant shall make restitution in the amount of $677,805.05, less credit for those amounts that he has deposited …

The defendant is sentenced to a period of probation of five years with the first nine months to be served in home detention under electronic monitoring.

(App. at 642-45.)

Upon announcement of the sentence, the government objected to the variance "from the Guidelines range of 70 months to home confinement" as unreasonable. (App. at 645.) In response, the Court stated "I thought you told me it would be somewhere under Mr. Hall," to which the government attorney replied, "I said that he was less culpable than Mr. Hall … but I also objected to Mr. Hall's sentence as unreasonable." (*Id.*)

The government has timely appealed the sentences of both Hall and Negroni.

15

## II.   Discussion[5]

### A.   *The Roles of District and Appellate Courts in Sentencing*

In sentencing a defendant, district courts follow a well-established three step process:  First, the court calculates the applicable Guidelines range.  *United States v. Tomko*, 562 F.3d 558, 567 (3d Cir. 2009) (en banc).  Second, it considers any motions for departure and, if granted, states how the departure affects the Guidelines calculation.  *Id.*  Third, it considers the § 3553(a) factors[6] and determines the

---

[5] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231.  We have jurisdiction pursuant to 18 U.S.C. § 3742(b) and 28 U.S.C. § 1291.

[6] Section 3553(a) lists the following factors for a court to consider:

> (1)  the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2)   the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

16

appropriate sentence, which may vary upward or downward from the range suggested by the Guidelines.[7] *Id.*

Our review of a criminal sentence "proceeds in two stages." *Id.* We first review for procedural error, "such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence – including an explanation for any deviation

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for … the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines … ;

(5) any pertinent policy statement … issued by the Sentencing Commission … ;

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

[7] As a matter of terminology, a "departure" refers to a deviation from the step-one Guidelines calculations based on provisions within the Guidelines themselves and results in a change to the recommended Guidelines range. A "variance," by contrast, refers to a deviation from the recommended Guidelines range based on the statutory factors outlined in § 3553(a). *Tomko*, 562 F.3d at 562 n.3.

17

from the Guidelines range." *Gall v. United States*, 552 U.S. 38, 51 (2007). If we find procedural error "our preferred course is to remand the case for re-sentencing, without going any further." *United States v. Merced*, 603 F.3d 203, 214 (3d Cir. 2010). In the absence of procedural error, we review for substantive reasonableness, and "we will affirm [the sentence] unless no reasonable sentencing court would have imposed the same sentence on that particular defendant for the reasons the district court provided." *Tomko*, 562 F.3d at 567. At both the procedural and substantive stages, we review for abuse of discretion. *United States v. Wise*, 515 F.3d 207, 217-18 (3d Cir. 2008).

### B. *Hall's Sentence*

On appeal, the government argues that the District Court committed procedural error in striking Paragraph 45 and, consequently, in failing to include the six-level enhancement. According to the government, the evidence of Hall's involvement in other frauds was so overwhelming that the Court abused its discretion by rejecting it, and the Court further erred by offering no explanation for its decision to strike Paragraph 45. Hall responds that the proof of his participation in other frauds was not overwhelming because evidence presented to the District Court challenged Waltzer's credibility. Moreover, Hall contends, as to the striking of Paragraph 45, the District Court adequately explained its decision by making it clear throughout the proceedings that it doubted Waltzer's story. Despite the vigor invested in the parties' competing arguments on this point, we need not decide whether the rejection of Paragraph 45 necessarily amounts to an abuse of discretion. It is sufficient to observe that, given the evidence supporting that portion of the PSR,

18

the District Court failed to give an adequate explanation for the rejection.

Waltzer told Kauffman that Hall participated in fraudulent claims in the Cendant and BankAmerica Class Actions by calling banks and other companies while falsely posing as an authorized agent of claimants in those Actions, as, for example, with respect to the Far East fraud. (*See supra* Part I(A)(1).) Waltzer's story in that regard was corroborated by the introduction of documentary evidence, including the script e-mail, and by evidence that Waltzer wired Hall $100,000 immediately after the Far East fraud and wired him hundreds of thousands of dollars in additional payments during 2003 and 2004. As the government rightly notes, the timing of the $100,000 payment strongly corroborates Waltzer's assertion that Hall was involved in the Far East fraud. Likewise, the fact that Waltzer's total payments to Hall were nearly three times greater than the $200,000 that Hall received in connection with the Nasdaq Class Action corroborates Waltzer's description of Hall's involvement as going beyond the filing of that single Nasdaq claim. Thus, we agree with the government that there is persuasive evidence to support the facts set forth in Paragraph 45.

Nonetheless, we recognize, as Hall argues, that the District Court was presented with evidence challenging Waltzer's account – particularly, Kauffman's admission that Hall's phone records do not show any of the calls Waltzer claims were made and Kauffman's acknowledgement of irregularities in the script e-mail. Furthermore, while Hall was paid some $600,000 more than his take on the fraudulent Nasdaq claim that underpins his guilty plea, that fact does not necessarily prove (as the District Court notes) that Hall's

19

additional participation was in frauds pertaining to the BankAmerica or Cendant Class Actions, which are the only bases for saying there were 250 or more victims of Hall's fraudulent activities.  Thus, although the financial evidence testified to by Kauffman corroborates some of Waltzer's account of Hall's participation in all three Class Actions, it is possible, given the evidence arrayed on both sides, that the District Court nonetheless found that account to be incredible. Certainly, the Court had indicated that it was "not willing to accept carte blanche what Waltzer told anybody."  (App. at 737.)  At the same time, however, the Court expressed skepticism that there was any "reason to say that [Waltzer was lying] in this context of his testimony."  (*Id*.)  Thus, it is not clear from the record whether the Court found Waltzer's account to be incredible or otherwise why, ultimately, the Court struck Paragraph 45.  We are left wondering.

Because "there is no way to review [the District Court's] exercise of discretion" when it did "not articulate the reasons underlying its decision," *Merced*, 603 F.3d at 216 (internal quotation marks and citation omitted), we will vacate Hall's sentence and remand for resentencing, trusting that the District Court will provide an explanation sufficient to allow for appellate review.[8]

---

[8] In arguing that the District Court erred when it struck Paragraph 45, the government also challenged what it describes as the District Court's refusal to consider transcripts of various phone calls that the government claims would prove Hall's participation in the other frauds.  Hall counters that the District Court did not refuse to consider the transcripts but, instead, simply set them aside for later consideration and that the government failed to bring them up

## C.    *Negroni's Sentence*

The government argues that Negroni's sentence was unreasonable because "the district court did not give meaningful consideration to the factors that called for a significant prison sentence."[9]    (Gov. Br. at 47.)    Negroni

again when the District Court gave it the opportunity.  Given our decision to remand for resentencing, we need not decide whether the District Court refused to consider the transcripts or whether such refusal would be an abuse of discretion.  On remand, the government is free to ask that the transcripts and any other evidence brought to the District Court's attention at sentencing be explicitly considered.

[9] Negroni argues that the government cannot challenge the procedural reasonableness of his sentence because, in its Statement of Issues on Appeal, the government asserted only that it was contesting the substantive reasonableness of Negroni's sentence and, therefore, has waived any challenge to the procedural reasonableness.  In the Statement of Issues and throughout its brief, the government does, indeed, describe its argument as challenging the substantive reasonableness of Negroni's sentence rather than the procedural reasonableness of the sentence.  Nonetheless, despite that description, many of the arguments it presents fall squarely within the definition of procedural error articulated by the Supreme Court in *Gall*.  As Negroni points out, for instance, *Gall* lists "failing to consider the § 3553(a) factors" as procedural error, 552 U.S. at 51, and the government claims that the District Court "failed to give meaningful consideration to the factors that called for a significant prison sentence," (Gov. Br. at 47).  Thus, despite the label applied

responds that, although the Court did not explicitly rely on all the § 3553(a) factors, it "weighed the totality of the factors … giving them meaningful consideration," and "had no duty to 'discuss and make findings as to each of the … factors [because] the record makes clear [it] took the factors into account in sentencing.'"[10]  (Negroni Br. at 54 (quoting *Tomko*, 562 F.3d at 568).)

by the government, its arguments include a challenge to the procedural reasonableness of Negroni's sentence.

Nevertheless, while we agree with Negroni that the government's arguments address primarily procedural errors, we do not agree that the government has somehow waived any argument with respect to procedural error simply because the Statement of Issues labels the challenge as substantive rather than procedural.  Negroni has identified no case in which an issue has been found waived where it was argued in the briefs but mislabeled in the Statement of Issues. Furthermore, while the Statement of Issues may have used the word "substantive" rather than "procedural," it still notified the Court and the parties that the issue on appeal is the reasonableness of Negroni's sentence, and the brief sets forth at length the precise bases for that challenge.  Negroni cannot, therefore, claim to have been left in the dark as to the nature of the government's challenge, and, in fact, Negroni has not claimed to have suffered any prejudice as a result of the government's mislabeling.   Thus, we reject Negroni's assertion that the government has waived any challenge to the procedural adequacy of his sentence.

[10] Negroni addressed the Court's consideration of the § 3553(a) factors in his discussion of the substantive reasonableness of his sentence because, as discussed *supra*

22

Again, our review is frustrated because, while the District Court individually identified each § 3553(a) factor, it did not discuss some of them and, as to those it did discuss, it did not explain how they justified the frankly dramatic downward variance it gave. The insufficiency of the explanation prevents us from judging whether the Court "gave meaningful consideration" to the relevant factors and is itself procedural error. In addition, to the extent the District Court's lenient sentence of Negroni was influenced by the government's assertion that Hall was more culpable than Negroni, that too is procedural error. We discuss each of those problems in turn.

1. *The District Court's Consideration of the § 3553(a) Factors and the Explanation for Its Sentence*

"Appellate review, limited though it is by the abuse-of-discretion standard, … requires district courts to plainly state the reasoning behind each sentence. Moreover, in deciding on appeal whether the reasons provided by a district court are adequate, the degree that a sentence varies from the

note 9, the government describes its arguments as addressing substantive reasonableness only. As already discussed, however, the sufficiency of a court's consideration of the § 3553(a) factors is a question of procedural reasonableness, not substantive, and we therefore consider it in that light. Other than arguing that the government has waived any argument regarding procedural reasonableness, Negroni does not offer any argument explicitly directed to the procedural reasonableness of his sentence.

23

recommendation given in the Guidelines matters." *United States v. Levinson*, 543 F.3d 190, 197 (3d Cir. 2008). Thus, while we eschew any strict proportionality test requiring that unusual variations from the Guidelines be based on equally unusual circumstances, we do require that a substantial variation be accompanied by a more complete explanation than would be required for a sentence within or only modestly outside the Guidelines range. *Id.*

Here, the Guidelines called for a range of 70 to 87 months' imprisonment and the District Court imposed a sentence of 60 months' probation, with 9 months' home confinement. The parties have not identified any case, and we have not found one, in which an appellate court upheld a probationary sentence that so significantly varied from the Guidelines range. Such a variance is genuinely extraordinary and should have been accompanied by a thorough justification of the sentence, "including an explanation for any deviation from the Guidelines." *Gall*, 552 U.S. at 51. Unfortunately, the District Court did not provide that kind of justification.

Indeed, the Court did not acknowledge that the sentence it chose deviated significantly from the Guidelines. While the District Court properly identified the recommended Guidelines range of 70 to 87 months' imprisonment, and thoroughly discussed some of the § 3553(a) factors, particularly the nature of the offense and of the defendant, at no point did it describe how those factors justified a deviation from the recommended range down to probation and in-home confinement. In a case involving such a substantial variance, it is not enough to note mitigating factors and then impose sentence. Rather, the chain of reasoning must be complete,

24

explaining how the mitigating factors warrant the sentence imposed.

It may be that the mitigating factors the District Court identified, such as Negroni's alleged personality disorder and his accompanying susceptibility to Waltzer's influence, could justify a variance. We confess our doubts, however, and emphasize the Sentencing Commission's express concern with the once-common practice of sentencing "to probation an inappropriately high percentage of offenders guilty of certain economic crimes, such as theft, tax evasion, antitrust offenses, insider trading, fraud, and embezzlement, that in the Commission's view are 'serious.'" U.S.S.G. § 1A1.4(d) (2010). Thus, if a district court seeks to vary from the Guidelines recommendation of incarceration for persons who have committed serious white-collar crimes, it must provide a thorough and persuasive explanation for why the congressionally-approved policy of putting white-collar criminals in jail does not apply. Not having done so in Negroni's case, the District Court committed procedural error.

Part of the failure to adequately address the variance lies in the lack of discussion of one highly relevant § 3553(a) factor in these circumstances, namely the need to avoid unwarranted sentencing disparities among similarly situated individuals. Where the Guidelines call for a minimum of nearly six-years' imprisonment, a sentence of probation surely implicates concerns over sentencing disparities, and that concern warrants explicit consideration. While the District Court identified the concern and stated it had considered that factor, it provided no explanation for why the

sentence it imposed was justified despite the clear disparity it seemed to create.[11]

In short, since there is not an adequate "explanation for [the] deviation from the Guidelines range," as required by *Gall,* 552 U.S. at 51, nor an explanation "sufficient for us to see that the particular circumstances of the case have been given meaningful consideration within the parameters of § 3553(a)," *Levinson*, 543 F.3d at 196, the sentence cannot stand.

### *(2)    The District Court's Consideration of the Relative Culpability of Hall and Negroni*

The inadequacy of the explanation for Negroni's sentence is exacerbated by what appears to be an inconsistency in the District Court's assessment of the relative culpability of Negroni and Hall.  The Court based its sentence in part on the government's assertion that Negroni was less culpable than Hall.  But that assertion had been effectively rejected by the Court's own factual findings and, therefore, could not warrant the probationary sentence.

---

[11] We say "seemed to create" because the disparities that matter are those between "similarly situated" individuals. *See United States v. King*, 604 F.3d 125, 145 (3d Cir. 2010) ("[S]entencing disparities are unreasonable only when the defendants are similarly situated.").  The District Court in this case noted circumstances which it evidently viewed as distinguishing Mr. Negroni from the ordinary fraud convict. Whether those distinctions take Mr. Negroni out of the heartland of circumstances contemplated by the Guidelines is one of the matters requiring added explanation.

26

In seeking a sentence for Hall at the upper end of the Guidelines range, the government had asserted that Hall was more culpable than Negroni. That assertion was based on "the testimony of Agent Kauffman … and the financial records that showed that [Hall] received over $800,000" from the scheme, a substantial portion of which came from frauds involving 250 or more victims, at least according to the government. (App. at 749-50.) In striking Paragraph 45, however, the District Court necessarily rejected at least some of the factual contentions advanced by Kauffman, and it implicitly rejected the government's basis for concluding that Hall was more culpable than Negroni. That is borne out by the offense levels calculated for the two Appellees: Negroni's offense level was 27; Hall's offense level, had it included the six-level enhancement, would have been 29, but, without that enhancement, it was only 23. Thus, having rejected the factual predicate for the six-level enhancement, the District Court also rejected the basis for concluding that Hall was more culpable than Negroni.

Despite that rejection, when the government objected to Negroni's sentence as unreasonable, the District Court's reply was that "you [, the government,] told me it would be somewhere under Hall," which suggests that the District Court felt constrained to give Negroni a lighter sentence than Hall's. (App. at 645.) Because a Court abuses its discretion when it bases a decision on a clearly erroneous finding of fact, *Tomko*, 562 F.3d at 567-68, the Court abused its discretion to the extent it concluded that Negroni needed a

27

lighter sentence than Hall despite the Court's rejection of the factual basis for concluding that Negroni was less culpable.[12]

In summary, the District Court committed procedural error in not adequately explaining Negroni's sentence and in basing that sentence, in part, on the undermined assertion that Hall was more culpable than Negroni. Consequently, Negroni must be resentenced.

## III.    Conclusion

For the foregoing reasons, we will vacate the sentences of both Hall and Negroni and remand for resentencing.

---

[12] We do not imply that in sentencing co-defendants a court cannot consider the relative culpability of those defendants. To the contrary, just as a court should ensure that it does not create sentencing disparities among similarly situated individuals, it should also ensure that its sentences appropriately reflect the relative culpability of individuals who are not similarly situated. Here, the District Court's error is that it failed to do the former and, in doing the latter, erroneously gave Negroni a more lenient sentence after having rejected the only expressed factual basis from which to conclude that Negroni was less culpable.